**File Name: 07a0084n.06**
**Filed: February 1, 2007**

NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

No. 05-6812

**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

BOBBY E. OODY,

      Plaintiff-Appellant,

v.

KIMBERLY-CLARK CORPORATION PENSION
PLAN,

      Defendant-Appellee.

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF TENNESSEE

Before:  BOGGS, Chief Judge; MARTIN, Circuit Judge and OLIVER, District Judge.[*]

SOLOMON OLIVER, JR., District Judge.  Plaintiff-Appellant, Bobby E. Oody (hereinafter, "Oody") appeals the judgment on the administrative record by the district court in favor of Defendant-Appellee Kimberly-Clark Corporation Pension Plan (hereinafter, the "Plan") on Oody's claim under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*. The Plan provides disability benefits when the Retirement Trust Committee for the Plan (hereinafter, the "Committee") determines that the eligible employee's condition is permanent and prevents the employee "from engaging in any occupation with his Employer commensurate with his education,

---

      [*]      The Honorable Solomon Oliver, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

training and experience. . . ." The district court ruled that the Committee thoroughly considered all of the evidence submitted in support of Oody's application for disability benefits and that "the Committee's decision that Oody was not totally and permanently disabled as required by the Kimberly-Clark Pension Plan was well-reasoned and consistent with the weight of the evidence." For the following reasons, we affirm.

## I. FACTUAL BACKGROUND

Oody was eligible for and participated in the Plan, as amended through December 31, 2000. The Plan provides for a monthly pension benefit for an employee who has at least five years of vesting service upon termination of his employment, if the termination of his employment is by reason of having become totally and permanently disabled. The Plan defines totally and permanently disabled in Section 10 as:

> A condition arising out of injury or disease which the Committee determines is permanent and prevents an Employee from engaging in any occupation with his Employer commensurate with his education, training and experience. . . .

Under the Plan, the Committee maintains the exclusive responsibility and the sole discretion for determining whether an employee satisfies the eligibility requirements for receiving total and permanent disability benefits. Specifically, the Plan provides:

> The Committee shall have all such powers as may be necessary to discharge its duties which are as follows: to construe or interpret the Plan, to determine all questions of eligibility, to compute the amount and determine the method of payment of any Benefits and to perform such other duties as are delegated to it under the Plan or Trust or as may from time to time be delegated to it by the Retirement Trust Committee. . . . The Committee shall exercise the powers granted to it under the Plan in its sole discretion . . . . All rules and decisions of the Committee shall be uniformly and consistently applied to all Employees and Pensioners under this Plan in similar circumstances and shall be conclusive and binding upon all persons affected by them.

If an applicant is denied total and permanent disability benefits, the applicant may appeal that decision within 60 days and can also submit additional supporting documentation. In evaluating a claim on appeal, the Committee takes into account all of the information in the existing claim file along with any additional information submitted.

Oody, who completed two years of high school education and later acquired a GED, was employed at the Kimberly-Clark Loudon, Tennessee facility as an hourly-paid employee from February 17, 1992, until May 14, 2001. He worked as a Maintenance Partner, which required him to squat, kneel, carry, climb ladders and stairs, crouch, bend, reach, stand, lift up to 150 pounds, and occasionally push and crawl. He fell from some scaffolding at work in 1999, causing him to experience chronic low back pain. Oody took a temporary leave of absence for his fall and received temporary weekly disability income benefits through Kimberly-Clark from June 7, 1999, until September 5, 1999. Oody then returned to work until about May 2, 2000, at which time he took a leave of absence due to his back pain. He again received temporary weekly disability benefits, from May 3, 2000, through October 31, 2000. Thereafter, Oody received long-term disability benefits through Kimberly-Clark from November 1, 2000, through June 20, 2003, when those benefits were terminated because the Committee determined that Oody no longer met the applicable definition for disability under Kimberly-Clark's Long-Term Disability Plan.

On May 17, 2001, Oody applied for permanent disability benefits under the Plan. Oody's initial application included information from Dr. Sidney Wallace, who noted that an MRI scan taken on June 21, 2000, showed disc dehydration at L4-5 and L5-S1 but that no other facet hypertrophy or disease was evident. Oody also submitted the May 31, 2001 report of Dr. Joe Browder in support of his initial application for benefits. Dr. Browder's report indicated an impairment in Oody's

musculoskeletal system and noted that Oody was restricted from performing ordinary work movements, or from working about machinery, or from standing or sitting, except for limited times, or from working, even on sedentary tasks for a full day. However, Dr. Browder opined that Oody could perform sedentary work for at least partial days. Dr. Browder stated that Oody's condition was permanent and that "all limitations are based on patient's subjective complaints of activity limiting pain."

The Committee also considered a two-day Functional Capacity Evaluation performed on Oody in October of 2000. Oody tested in the light work classification according to the Department of Labor standards. However, Oody scored nine out of a possible sixteen on the Waddell's test, which indicated exaggerated pain behavior. Oody also tested invalid on six of seven validity tests, indicating that Oody was not exerting maximum effort on the test.

Additionally, on April 25, 2001, Oody underwent an independent medical examination by Dr. Mark MacNaughton, an orthopaedic surgeon. During his exam, Dr. MacNaughton noted that Oody demonstrated a "theatrical response" and claimed to have "exquisite" pain shooting throughout his entire lumbar spine while performing a routine clonus maneuver of the right ankle. Dr. MacNaughton found "no measurable atrophy" in Oody's lower extremities, and stated that Oody was "quite muscular [with] excellent tone in his lower legs and thigh musculature." After reviewing the work requirements of a Maintenance Partner at Kimberly Clark, Dr. MacNaughton did not believe that "with [Oody's] exaggerated symptoms in response to previous workup, that he would even be able to spend a portion of an hour completing his regular [work] requirements." Dr. MacNaughton did state that "sedentary or light work with limited standing, lifting, squatting, bending, and carrying maybe [sic] acceptable even as of tomorrow."

Additionally, Dr. MacNaughton noted that Oody was "morbid[ly] obese" and stated that "weight control needs to be [of] major importance. . . . More aggressive treatment for his obesity certainly would be beneficial to his overall ambulatory skills and hopefully lessen his symptoms. It also might make his ability to use an external orthosis or lumbar braces more appropriate." Dr. MacNaughton suggested that Oody undergo an EMG nerve study, bone scan, or laboratory evaluation to rule out other forms of inflammatory arthropathies, as Oody had been "recalstrent [sic] to subjective improvements" despite fairly aggressive non-operative treatment for his back pain. Dr. MacNaughton also recommended that a CT myelogram be performed for further evaluation of Oody's radiculopathy symptoms. The record contains no evidence that Oody followed any of Dr. MacNaughton's recommendations.

The Committee denied Oody's initial application for benefits in a letter dated November 13, 2001, concluding that although the evidence submitted in support of Oody's application demonstrated that he had been diagnosed with chronic low back pain, it did not establish that he was totally and permanently disabled as defined by the Plan. The Committee found and explained that: (1) Oody's Functional Capacity Evaluations were unreliable because of a high incidence of invalid test results "indicating exaggerated pain behavior and suboptimal effort;" (2) he had not reached maximum medical improvement, based on the fact that Oody had not followed through on several of the orthopaedic surgeon's recommendations; and (3) Oody was capable of returning to light or sedentary work. Moreover, the Committee reasoned that Dr. Browder's opinions were based on Oody's "subjective complaints of pain" and that Oody had not submitted any objective medical records to support Dr. Browder's conclusion. The Committee informed Oody that he could appeal, stating:

-5-

In order for you to cure this denial you need to provide the Committee with all medical documentation relative to your case including medical documentation from any other physicians who may have treated you. Additional medical information, including a valid Functional Capacity Evaluation, must be sufficient to indicate your condition is permanent and prevents you from engaging in any work at Kimberly-Clark commensurate with your education, training and experience, as provided in the definition of 'Total and Permanent Disability.'

After his initial application was denied, Oody appealed and submitted two additional pieces of information for the Committee to consider. First, Oody submitted a Social Security notice, dated February 22, 2002, stating that he had been awarded disability benefits, effective May 2, 2000. Second, Oody submitted a letter from Dr. Randall Morton, who was Oody's personal physician, dated July 22, 2003. Dr. Morton opined that Oody was "currently disabled due to multiple medical problems," including degenerative disc disease of the lumbar spine, lumbar radiculopathy, bilateral hip and knee pain, diabetes, and high blood pressure. Dr. Morton stated that the degenerative problems in Oody's back, knees and hips would continue on a permanent basis. However, Dr. Morton's report did not contain any objective medical information in support of his opinion that Oody was totally disabled due to multiple medical problems.

On November 3, 2003, the Committee again denied Oody's claim, after considering the additional information submitted by Oody. The Committee concluded that Oody was not totally and permanently disabled as defined by the Plan. In its denial letter dated November 5, 2003, the Committee explained that although it took Oody's qualification for Social Security Disability Income into consideration, that fact was not determinative because the Social Security Administration uses a different standard to determine eligibility for disability benefits than does the Plan. Unlike the Plan at issue, Social Security does not require that the disability be permanent. The Committee also noted that Dr. Morton had not provided any objective medical information and that no EMG, nerve

conduction studies, or myelogram had been performed. However, the Committee did inform Oody that it would permit him a one-time special review if he had some additional information that he believed would affect his claim.

Thereafter, Oody submitted additional evidence consisting of medical notes, dated October 8, 2003, documenting an exam performed by Dr. Wallace. Dr. Wallace noted that Oody weighed 328 pounds and that according to Oody, had, "occasional pain into the lower extremity on the right side and had some pain on the left." Based upon x-rays taken, Dr. Wallace diagnosed Oody with "lumbar radicular syndrome bilateral as marked degenerative disk disease." Dr. Wallace opined that Oody was permanently unable to perform his usual occupation, but did not comment on Oody's residual functional capacity.

On December 3, 2003, the Committee again denied Oody's claim, determining that Oody still did not establish that his condition satisfied the Plan's definition of totally and permanently disabled. In its denial letter dated December 11, 2003, the Committee specifically wrote, "[a]lthough the Committee previously advised that you obtain an EMG, nerve conduction studies or a myelogram, none of those tests were performed." The Committee concluded that Dr. Wallace's notes did not significantly add to the previous information considered by the Committee and "did not justify changing their prior determinations that [Oody's] condition [did] not permanently prevent [him] from engaging in any occupation with Kimberly-Clark commensurate with [his] education, training and experience."

## II. STANDARD OF REVIEW

We review *de novo* the district court's decision and apply the same legal standard. *Whitaker v. Hartford Life & Accident Ins. Co.*, 404 F.3d 947, 949 (6th Cir. 2005) (citing *Wilkins v. Baptist*

*Healthcare System, Inc.*, 150 F.3d 609, 613 (6th Cir. 1998)). In reviewing administrative decisions made by plan administrators with discretionary authority, this court will overturn the decision only in circumstances where the court finds the plan administrator's determination to be arbitrary and capricious. *See Shelby County Health Care Corp. v. Southern Council of Indus. Workers Health & Welfare Trust Fund*, 203 F.3d 926, 933 (6th Cir. 2000) (citing *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998) (*en banc*)). The arbitrary and capricious standard "is the least demanding form of judicial review. . . . When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Kentucky Finance Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (citations omitted).

### III. LAW AND ANALYSIS

Oody argues the Committee's decision to deny disability benefits to him was arbitrary and capricious because the medical evidence he submitted supported a finding that he was permanently and totally disabled under the Plan. We disagree and find that the Committee's decision was not arbitrary and capricious because it offered a reasoned explanation, consistent with the weight of the evidence, for its decision denying Oody benefits. The Committee determined that Oody failed to submit sufficient objective evidence to establish that he was permanently and totally disabled as defined by the Plan.

As part of the total and permanent disability application process, the Committee considers all of the objective medical evidence submitted by or on behalf of an applicant in support of his or her application. The Committee may also request a valid Functional Capacity Evaluation. The Committee made such a request in Oody's case, yet he failed to provide one. The Committee reviewed Oody's claim three times and each time provided him with a letter of its findings, after

considering all of the evidence that Oody submitted, as discussed *supra*. In the first denial letter to Oody, the Committee concluded that Oody was not totally and permanently disabled pursuant to the Plan's requirements because: (1) Oody's Functional Capacity Evaluations were unreliable due to a high incidence of invalid test results indicating he exaggerated his pain responses and did not exert maximum effort; (2) Oody had not reached maximum medical improvement, based on the fact that Oody had not followed through on several of the orthopaedic surgeon's recommendations; and (3) Oody was capable of returning to light or sedentary work.

When Oody appealed and submitted additional information consisting of the Social Security Administration's determination that he was disabled and a letter from Dr. Morton, the Committee reasoned that Dr. Morton's letter did not change its decision because Dr. Morton failed to submit any medical reports to support his conclusion that Oody was "fully disabled." The Committee noted that no EMG, nerve conduction studies, or myelogram had been performed. The Committee also explained why it was not bound by the Social Security Administration's determination that Oody was disabled.

Finally, the Committee granted and conducted a discretionary special review of Oody's claim and re-reviewed the information previously before it, as well as the new information submitted by Oody consisting of Dr. Wallace's notes and x-ray of his lumbar spine. The Committee again explained that these new documents did not adequately demonstrate that Oody's condition was permanent and prevented him from "engaging in any occupation with Kimberly-Clark commensurate with [his] education, training and experience." The Committee specifically wrote, "[a]lthough the Committee previously advised that you obtain an EMG, nerve conduction studies or a myelogram, none of those tests were performed."

We find that the Committee's denial of Oody's claim for permanent and total disability benefits was not arbitrary and capricious. We base this conclusion on the highly deferential nature of our review and the fact that the Committee offered a reasoned explanation for its decision denying Oody benefits: he failed to submit sufficient objective evidence to establish that he was permanently and totally disabled, as defined by the Plan. Further, we find that the Committee's explanation is supported by the record. The Committee clearly found that the medical evidence submitted by Oody was not supported by objective evidence and therefore was insufficient to demonstrate that he was permanently disabled within the meaning of the Plan. Indeed, the Committee even suggested to Oody the nature of the medical information which was needed in order for it to fully evaluate his claim. That information was not provided by Oody.

Oody also argues that the Committee abused its discretion when it denied his application for total and permanent disability benefits without identifying the occupations at Kimberly-Clark which were commensurate with his education, training and experience, that he could perform. The Plan's first denial letter to Oody on November 13, 2001, states that one reason Oody's claim was being denied was because "Dr. MacNaughton felt that [Oody] could return to work in a light or sedentary duty job, which is inconsistent with the Plan's requirements that [Oody] be incapable of engaging in any occupation with Kimberly-Clark commensurate with [his] education, training and experience." The Committee did not identify any positions at Kimberly-Clark that were light or sedentary duty positions, nor did it make any findings as to Oody's education, training and experience. Oody argues that this omission makes the Plan's decision arbitrary and capricious in that it failed to abide by the language found in Section 10 of the Plan.

Section 10 of the Plan defines totally and permanently disabled as:

A condition arising out of injury or disease which the Committee determines is permanent and prevents an Employee from engaging in any occupation with his Employer commensurate with his education, training and experience. . . .

We conclude that the district court correctly decided this issue when it stated, "while the medical evidence suggested that Oody's condition may have precluded him from performing his prior occupation as a maintenance worker, the evidence does not suggest that he was incapable of performing another occupation at Kimberly-Clark." Regardless of the court's determination on this issue, the Committee's decision that Oody was not permanently disabled was not arbitrary and capricious because it was also based on the fact that he had not submitted sufficient objective medical evidence to support a finding that he was permanently disabled.

## IV.  CONCLUSION

For the foregoing reasons, the district court's judgment on the administrative record in favor of the Plan is affirmed.