**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0144n.06
Filed: March 11, 2008

**No. 07-5423**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| ELIZABETH B. ROSE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF KENTUCKY |
| HARTFORD FINANCIAL SERVICES | ) | |
| GROUP, INC., et al., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |
| | ) | |

Before: NORRIS, BATCHELDER, and GIBBONS, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** Plaintiff-appellant Elizabeth Rose claims that Continental Casualty Company ("Continental") wrongfully terminated her long-term disability benefits in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*. The district court determined that Continental's decision to terminate Rose's benefits was not arbitrary and capricious, and Rose appealed. Upon review of the administrative record, we also conclude that Continental's decision was not arbitrary and capricious, and we therefore affirm the judgment of the district court.

I.

1

Elizabeth Rose previously worked as a psychotherapist and clinical social worker at the Medical Center Clinic, P.A., in Pensacola, Florida. In 1994, Rose began receiving long-term disability benefits due to the effects of chronic fatigue syndrome and chronic hepatitis C.[1] Rose's long-term disability policy ("the policy") was initially administered by Continental. Under the terms of the policy, which grants Continental discretionary authority to construe and interpret the policy, an employee is considered totally disabled and eligible for long-term disability benefits if, during an initial twenty-four month period, "because of injury or sickness, he is continuously unable to perform the essential and/or majority of duties of his occupation." After the initial twenty-four month period, an employee is considered totally disabled if "because of injury or sickness, he is continuously unable to perform the duties of any occupation for which he is reasonably qualified by education, training or experience." Rose continued to receive long-term disability benefits after the initial twenty-four month period, and from time to time, Continental reviewed Rose's disability claim.[2] When Continental reviewed Rose's claim in 2004 and 2005, it determined that Rose no longer satisfied the policy's definition of disability. Rose's long-term disability benefits were terminated on April 29, 2005.

At the outset of Continental's evaluation of Rose's claim, the company requested that Rose complete a "claimant questionnaire." On the questionnaire, dated July 29, 2004, Rose noted that her

---

[1]Rose was later diagnosed with fibromyalgia as well.

[2]Hartford Financial Services Group, Inc., ("Hartford") took over administration of Rose's policy prior to the termination of her benefits. Although Rose initially pursued her claim against both Hartford and Continental, on September 19, 2006, the parties entered into a stipulation voluntarily dismissing Hartford. The parties stipulated that Continental is the party responsible for paying disability benefits under the policy.

2

current medical conditions included chronic hepatitis C, chronic fatigue syndrome,[3] fibromyalgia,[4] cognitive difficulties, and sleep problems. Rose explained that these conditions made it impossible for her to have a set schedule and that her friends and family helped her with shopping and home upkeep. She further noted that her condition had worsened in the past eighteen months: her fatigue had become more extreme, her fibromyalgia now affected her arms as well as her legs, her most recent liver biopsy showed an increase of fibrosis, and she was unable to stand for more than twenty to thirty minutes at a time.

Continental also requested Rose's medical records from her physicians, Dr. Jeff Foxx, Dr. Mark Dougherty, and Dr. Martin Korkowsky. The records from Dr. Doughtery showed that Rose's last visit was on September 11, 2003, for a checkup regarding her hepatitis C. Dr. Doughtery diagnosed Rose with hepatitis C, fibromyalgia, chronic fatigue syndrome, and depression. According to the records from Dr. Foxx, Rose's last visit occurred on January 13, 2004, for an examination regarding her fibromyalgia and chronic fatigue syndrome. In the records, Dr. Foxx indicated that Rose had multiple sore fibromyalgia trigger points. Rose last visited Dr. Korkowsky

---

[3]Chronic fatigue syndrome is "marked by incapacitating fatigue that rest does not relieve; it is frequently associated with decreased concentration, irritability, sleep disturbances, recurrent sore throats, low-grade temperatures, swollen glands, and bone or muscle aches." *Taber's Cyclopedic Medical Dictionary* 402 (19th ed. 2001). The cause of the syndrome is unknown, and "[t]he patient's symptoms may wax and wane, are difficult to validate objectively, but are subjectively debilitating." *Id.*

[4]Fibromyalgia is characterized by "chronic and frequently difficult to manage pain in muscles and soft tissues surrounding joints." *Id.* at 762. According to the American College of Rheumatology, a patient will be diagnosed with fibromyalgia if she has (1) a history of widespread pain (pain must be present for at least three months) and (2) pain in at least eleven out of eighteen tender point sites upon digital palpation. *Id.*

on April 2, 2003, and the records from this visit noted diagnoses of fibromyalgia and chronic fatigue syndrome.

Additionally, Continental hired an investigative company to obtain surveillance footage of Rose in order to procure evidence of her level of functionality. An investigator videotaped Rose on Wednesday, August 4, 2004, and Thursday, August 5, 2004.[5] On August 4, Rose was observed walking around a convenience store, entering a veterinary clinic, and shopping at a grocery store. During the hour and a half Rose was away from her house, she repeatedly entered, exited, and operated her vehicle. At the grocery store, Rose pushed a shopping cart in a normal manner without any assistance. Rose repeatedly bent, turned, and reached, and she picked up a 37.5 pound bag of dog food and placed it in the lower part of her cart. After paying for her groceries, Rose pushed the "very full cart" to her vehicle and unloaded it without assistance. On August 5, Rose was away from her house for approximately five hours, during which she visited a produce stand, two convenience stores, two retirement homes, and other businesses. The investigator observed Rose assisting an elderly woman enter and exit Rose's vehicle. At one point, Rose carried the elderly woman's walker.

On January 6, 2005, a Continental investigator interviewed Rose at her home. During the interview, Rose walked and moved through her home without many noticeable limitations, although at times she limped slightly. While Rose did display pain indicators, such as wincing, moaning, flexing her ankles and legs, rubbing her elbow, and squirming while seated, the investigator noted that Rose had a good range of motion: she twisted in her seat, leaned, reached, swung one leg to push

---

[5]The investigator attempted to conduct surveillance in the late afternoon of August 3, 2004, as well, but did not observe any activity at that time.

a dog, squatted to close a door, and wrestled with two of her dogs to pull them away from the door. The investigator did not observe any type of cognitive or concentration difficulties, except for Rose's reversal of a numerical pain scale. The investigator showed Rose the surveillance video, and Rose stated that the video represented her normal level of functionality on one of her best days.

At the interview, the investigator took Rose's "continuing disability statement." Rose explained that she cannot keep a schedule, that her cognitive issues are unacceptable for her profession, and that her nausea, fatigue, swollen leg muscles, and chronic pain prevent her from returning to work. Rose noted that she uses a cane 40% to 50% of the time and that she has used the cane more in the past six months. She described her maximum level of functionality on her best day: she can walk for a maximum time of 15 to 20 minutes; she has a slow and limping gait; she can shop for 30 minutes; she can stand for 10 minutes; she can lift and carry items that weigh a maximum of 3 to 4 pounds; she is able to sit for one hour; she can bend, twist, push, pull, and reach; she cannot squat; kneeling is painful; walking up stairs is difficult; she cannot concentrate; she has trouble sleeping; and she has difficulty getting in and out of her vehicle. She noted that she does not do two activities in the same day. However, she also explained that she tries to improve her condition by attempting to stay as physically active as possible.

When contacted by Continental, Rose's current treating physicians, Drs. Doughtery and Foxx, did not wish to comment on her ability to work. Continental thus obtained an independent review of Rose's medical records from Dr. Harvey A. Popovich, a certified independent medical examiner, who concluded that Rose was capable of working full-time. In addition to reviewing Rose's records and the surveillance video, Dr. Popovich attempted to contact Drs. Doughtery and Foxx. Dr. Popovich was unable to speak with Dr. Doughtery, but he did converse with Dr. Foxx.

Dr. Foxx apparently indicated that there was no great risk in Rose returning to work. However, after Dr. Popovich sent a letter to Dr. Foxx summarizing their conversation, Dr. Foxx responded in a letter that he was in disagreement with the summary and he was "in no way at this point in time able to comment on [Rose's] disability" or her ability to return to work. Dr. Popovich then informed Continental that Dr. Foxx's letter had no effect on his conclusion regarding Rose's ability to work.

Continental also conducted a vocational review to identify possible employment positions that Rose might obtain. The review identified several positions, including psychiatric social worker, substance abuse counselor, assistant manager of customer service, and customer service representative, that would be suitable for Rose's functional abilities and were available in Rose's geographic area.

On the basis of its review of Rose's medical records, the surveillance footage, the interview, and the claimant questionnaire, Continental concluded that Rose no longer satisfied the definition of disability as stated in her policy and terminated Rose's long-term disability benefits on April 29, 2005. Continental notified Rose of its decision in a letter, which noted, *inter alia*, "[t]he observations documented during surveillance efforts are disproportionate with the limitations you reported in the questionnaire that you completed and the representations made in your interview." The company also informed Rose that she could appeal the decision and submit additional information for Continental's consideration on appeal.

Rose appealed Continental's decision. In a twenty-nine page letter dated September 30, 2005, Rose described her medical history and current level of functionality in detail. She explained that she has never been told to limit or restrict her activities by her doctors; rather, her doctors have encouraged her to exercise as much as possible. She asserted that her symptoms change from day

6

to day, and, consequently, a videotape cannot adequately capture her health problems. Rose also submitted letters from her friends and neighbors detailing certain aspects of her disability. Additionally, Rose submitted a letter from her new treating physician, Dr. Joshua B. Huffman, who stated that Rose had a long history of chronic fatigue syndrome and fibromyalgia, both of which are difficult to diagnose, understand, and treat. Dr. Huffman stated his examination of Rose revealed tender points consistent with fibromyalgia. Rose's appeal also contained her medical records from Dr. Huffman, which indicated that she had chronic fatigue syndrome, fibromyalgia, chronic hepatitis C, insomnia, and arrhythmia.

Upon Rose's appeal, Continental requested another medical review of Rose's records from a different physician, Dr. James Bress. Dr. Bress reviewed Rose's medical records and the surveillance video, and he contacted Dr. Huffman. In his discussion with Dr. Bress, Dr. Huffman opined that Rose's fatigue and pain, as reported by Rose, prevent her from functioning in any occupation. Dr. Huffman did, however, agree that all of Rose's symptoms are "subjective with no objective findings." While Dr. Huffman acknowledged the activity on the surveillance video, he also stated that it reflected one of Rose's best days. Dr. Huffman also noted that he tries to be a "patient advocate." On the basis of his review of Rose's file and his discussion with Dr. Huffman, Dr. Bress concluded that Rose is capable of full-time sedentary work, which consists of work that requires sitting six out of eight hours per workday, lifting no more than ten pounds occasionally, and frequently lifting small objects weighing less than ten pounds. On December 7, 2005, Continental informed Rose that it had reviewed her appeal and her benefits would not be reinstated, as the company had concluded that Rose could perform at least "sedentary work," as defined by the Department of Labor.

On April 20, 2006, Rose filed a complaint in Kentucky state court. Her case was removed to federal court on May 15, 2006. On March 8, 2007, the district court rendered a judgment on the administrative record. The district court determined that Continental's decision to terminate Rose's long-term disability benefits was not arbitrary and capricious. Rose filed this timely appeal on April 6, 2007.

II.

In an ERISA benefits case, this court reviews the decision of the district court *de novo*. *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 361 (6th Cir. 2002) (citing *Gatlin v. Nat'l Heathcare Corp.*, 16 F. App'x 283, 288 (6th Cir. 2001)). Where the benefit plan at issue gives the plan administrator the discretionary authority to construe and interpret the plan, as in the instant case, the plan administrator's decision is reviewed under the arbitrary and capricious standard. *Id.*; *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 710 (6th Cir. 2002). In the instant case, the parties do not dispute the applicability of the arbitrary and capricious standard of review.

"The arbitrary and capricious standard is the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Hunter*, 220 F.3d at 710 (citations and quotation marks omitted). Under this deferential standard of review, an appellate court will uphold the plan administrator's decision if it is "rational in light of the plan's provisions." *Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 (6th Cir. 2000) (quoting *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996)). Stated differently, if the decision "is the result of a deliberate, principled reasoning process and if it is supported by substantial

8

evidence," the decision will be upheld. *Elliot v. Metro. Life. Ins. Co.*, 473 F.3d 613, 617 (6th Cir. 2006) (quoting *Glenn v. Metro. Life Ins. Co.*, 461 F.3d 660, 666 (6th Cir. 2006)).

III.

We are thus charged with determining whether Continental's decision that Rose is able to "perform the duties of an[] occupation for which [s]he is reasonably qualified by education, training or experience" was the result of a "deliberate, principled reasoning process" and is supported by substantial evidence. *See id.* Rose offers a number of arguments in support of her claim that Continental's decision was arbitrary and capricious.

A.

Rose correctly notes that a conflict of interest is present in this case: under Rose's policy, the insurer both decides whether the insured's claim is covered and pays the insured's benefits. Although the existence of a conflict of interest does not alter our standard of review, this court must take into consideration the conflict as a factor in determining whether Continental's decision was arbitrary and capricious. *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 292-93 (6th Cir. 2005). Due to Continental's dual role in this situation, "the potential for self-interested decision-making is evident." *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006) (quoting *Univ. Hosps. of Cleveland*, 202 F.3d at 846 n.4). However, in evaluating such a conflict of interest, the court must "look to see if there is evidence that the conflict in any way influenced the plan administrator's decision." *Id.* (citing *Carr v. Reliance Standard Life Ins. Co.*, 363 F.3d 604, 606 n.2 (6th Cir. 2004)). As Rose has provided no evidence that Continental's conflict of interest actually motivated its denial of benefits, the mere existence of this conflict does not render its decision arbitrary and capricious. *See Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007).

9

B.

Rose argues that Continental failed to give sufficient weight to the information provided by her treating physicians. Indeed, Continental cannot "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Smith v. Continental Cas. Co.*, 450 F.3d 253, 262 (6th Cir. 2006) (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)). However, Continental noted in its letters to Rose that it had reviewed and taken into account the information proved by her treating physicians in considering her claim. As this court has explained,

> when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision.

*Evans*, 434 F.3d at 877 (quoting *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003)). In the instant case, neither Dr. Foxx nor Dr. Doughtery wished to comment on Rose's ability to work. Only Dr. Huffman, a physician Rose began to see after her benefits were terminated, opined on Rose's functional ability. In a letter to Continental, Dr. Huffman noted, "My limited experience with [Rose] tells me she is honest and her symptoms are real, her exam reveals tender points consistent with fibromyalgia." Additionally, in a conversation with Dr. Bress, Dr. Huffman stated that, based on Rose's self-reported symptoms of fatigue and pain, she could not function in any occupation. Dr. Huffman also acknowledged that he tries to be a "patient advocate." Continental contends that Dr. Huffman's conclusory statement, which was based only on Rose's self-reported symptoms and was provided only after Rose was denied benefits, was simply unpersuasive, particularly in light of his self-described role as a "patient advocate."

10

Continental appears to have provided a "reasoned explanation, based upon the evidence," for its decision to credit the opinions of the independent medical examiners over that of Dr. Huffman. *See id.* Two of Rose's doctors were unwilling to comment on her ability to work, and her third, most recently retained doctor offered only a conclusory statement that she could not work; in contrast, two independent medical examiners concluded that Rose was capable of performing sedentary work. Although Continental's decision to conduct file reviews of Rose's medical records—rather than a physical examination—is a factor that must be considered in determining whether Continental acted in an arbitrary and capricious manner, there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *See Calvert*, 409 F.3d at 296. In his file review, Dr. Popovich acknowledged Rose's fibromyalgia, chronic fatigue syndrome, and hepatitis C, but noted that Rose's medical records did not document any functional impairments with respect to Rose's upper extremities, lower extremities, or spine. Additionally, Dr. Popovich noted that Rose's medical conditions are well-controlled, as evidenced by the surveillance video demonstrating that Rose is capable of the activities of daily living, including traveling, walking, lifting, and carrying.

Without any knowledge of Dr. Popovich's assessment, Dr. Bress reviewed Rose's medical records, viewed the surveillance video, spoke with Dr. Huffman, and considered Rose's interview, her appeal letter, and the additional evidence submitted with her appeal. Dr. Bress noted that Rose was seated "reasonably comfortably" during her three-and-a-half-hour interview and observed the discrepancies between the surveillance video and Rose's reported level of functionality. Dr. Bress acknowledged that Dr. Huffman had opined that Rose could not work full-time, but noted that Dr. Huffman, in his own words, was a "patient advocate" and was merely reflecting Rose's subjective

11

complaints of fatigue and pain. Given that Dr. Huffman made only a conclusory statement as to Rose's ability to work, Dr. Bress's conclusion that there was "no documented evidence that [Rose] cannot function at the sedentary level on a full-time basis" was not unreasonable. *Cf. Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 878 (9th Cir. 2004) ("With a condition such as fibromyalgia, where the applicant's physicians depend entirely on the patient's pain reports for their diagnoses, their *ipse dixit* cannot be unchallengeable . . . . That the administrator ultimately rejects the applicant's physicians' views does not establish that it 'ignored' them.") Accordingly, Continental's reliance on the independent file reviews of Drs. Bress and Popovich was not arbitrary and capricious.

C.

Rose also claims that Continental did not give sufficient weight to the five letters submitted on her behalf by her friends and neighbors. In the letters, Rose's friends and neighbors explained that, due to Rose's medical condition, they helped her with yard work, home upkeep, and running errands. The letters noted Rose's honesty and opined that Rose was unable to work in any occupation. However, when Continental informed Rose of its decision to deny her claim on appeal, the company noted that it had considered her letter of appeal and the letters submitted on her behalf. Continental stated, "Your friends and neighbors are not aware of your activity beyond your home and further are not clinicians that can provide documented medical data on physical/clinical examinations that would support your self-reported complaints and further that would support your inability to perform any work activity." Indeed, while it may be the case that Rose needs assistance with home maintenance and other tasks, as her neighbors attest, this does not prove that Rose is incapable of sedentary employment. As Continental notes, the individuals who wrote on behalf of

12

Rose are not clinicians who have examined her functional capacity, and, consequently, Continental, quite logically, chose to credit the medical evaluations of Drs. Bress and Popovich rather than the comments of Rose's friends and neighbors. Continental did not "arbitrarily refuse to credit" Rose's layperson evidence, *Smith*, 450 F.3d at 262; rather, Continental considered the submitted letters and provided a reasoned explanation for its decision not to defer to this evidence.

D.

Rose further contends that Continental placed too much emphasis on the surveillance video documenting her activities on August 4, 2004, and August 5, 2004. As the district court noted, however, Continental was not required to "ignore the inconsistencies between Rose's assessment of her level of activity and the videotape of her activities." In her January 2005 interview, Rose reported a level of functionality that was, to some degree, inconsistent with that shown in the surveillance video. For instance, in the interview Rose stated that she is unable to squat, but she was observed squatting in the grocery store on August 4 and, apparently, during the interview itself. Rose declared that she cannot lift more than three to four pounds; however, in the grocery store, she lifted a 37.5 pound bag of dog food, pushed a full shopping cart, and unloaded groceries into her vehicle. She stated that she has difficulty entering and exiting her vehicle but was observed doing so without apparent difficulty on the surveillance video. Although Rose claimed that she is unable to perform two activities on the same day, she was videotaped doing a number of activities, including grocery shopping and assisting an elderly woman with a walker, on two consecutive days.

Notwithstanding these discrepancies, Rose argues that the surveillance video fails to show the physical toll these two days of activity exacted upon her and, moreover, it does not demonstrate

13

that she is capable of performing a full forty-hour workweek. Rose compares her situation to that of the plaintiff in *Carradine v. Barnhart*, a Seventh Circuit social security benefits case:

> [Plaintiff] does not claim to be in wracking pain every minute of the day. When she feels better for a little while, she can drive, shop, do housework. It does not follow that she can maintain concentration and effort over the full course of the work week.

360 F.3d 751, 755-56 (7th Cir. 2004). While Rose's point is well-taken, in *Carradine*—which is neither binding authority in this court nor an ERISA benefits case—the plaintiff did, in fact, present persuasive evidence of her disabling pain; for instance, the plaintiff underwent the surgical implantation of a catheter and spinal-cord simulator in order to ease her pain. *Id.* at 755. Here, Rose carries the burden of presenting evidence showing that she was disabled from performing any occupation for which she was reasonably qualified by education, training, or experience. *See Tracy v. Pharmacia & Upjohn Absence Payment Plan*, 195 F. App'x 511, 516 n.4 (6th Cir. 2006) (noting that the plaintiff bears the burden of proof in an ERISA benefits case). Rose produced very little such evidence; she offered merely the letters of her neighbors attesting to her need for assistance with home upkeep and other tasks, the conclusory statement of her newly retained doctor, and her own statement regarding her condition. While the surveillance video may not, by itself, prove that Rose is capable of working forty hours a week, Rose fails to appreciate that she bore the burden of producing evidence that she was disabled under the terms of the policy. Indeed, Rose's claim that Continental failed to consider her cognitive impairment suffers from a similar flaw: there is virtually no evidence in the administrative record regarding Rose's cognitive abilities. That Continental chose

to disregard Rose's *ipse dixit* regarding her cognitive impairment cannot be deemed arbitrary and capricious.[6]

Rose also contends that, while over-emphasizing the surveillance video, Continental ignored objective evidence of her disability documented by the investigator during her interview. The investigator noted that, during the interview, Rose displayed pain indicators, such as wincing, moaning, flexing her ankles and legs, rubbing her elbow, and squirming while seated. The investigator also stated that Rose had reversed the numerical pain scale in reporting her level of pain. To be sure, Continental did not acknowledge this evidence in the two letters in which it explained why the company was denying Rose's benefits. However, in his review of Rose's medical records, Dr. Bress did note Rose's display of pain during the interview but ultimately concluded that, based on her records as a whole, Rose could perform full-time sedentary work. Moreover, as Dr. Bress also noted, the investigator stated Rose had a good range of motion; during the interview, Rose twisted in her seat, leaned, reached, swung a leg to push a dog, and squatted to close a door. While it would have been desirable for Continental to explicitly acknowledge the pain Rose displayed during her interview, Continental's failure to do so does not render its decision arbitrary and capricious, particularly in light of Dr. Bress's consideration of Rose's pain in his review of her records.

E.

Continental and Rose spar over the significance of the lack of objective evidence of Rose's disability in the administrative record. Continental does not dispute Rose's diagnoses of

---

[6]In fact, there is some evidence that could be construed to undermine Rose's claim of cognitive impairment. As Continental notes, Rose was apparently capable of composing a twenty-nine page letter of appeal.

fibromyalgia, chronic fatigue syndrome, and hepatitis C; however, the company asserts that Rose has failed to present objective evidence of any functional limitations resulting from these conditions. To this end, Continental argues for the adoption of the First Circuit's reasoning in *Boardman v. Prudential Insurance Co. of America*, 337 F.3d 9 (1st Cir. 2003). The *Boardman* court noted, "While the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis." *Id.* at 17 n.5. In *Boardman*, as in the instant case, the plaintiff claimed to suffer from, *inter alia*, fibromyalgia and chronic fatigue syndrome. *Id.* at 13 n.4. The *Boardman* court concluded that the insurer did not act arbitrarily in terminating the claimant's long-term disability benefits where the claimant's medical record did not indicate "any limitations or restrictions, based on objective findings, that would preclude [the claimant] from performing any occupation for which she is suited," as required by the claimant's long-term disability policy. *Id.* at 16-17.

Rose disagrees with Continental's assertion that she must present objective evidence of her level of functionality in order to qualify for long-term disability benefits under the policy. Citing *Torgeson v. Unum Life Insurance Co. of America*, 466 F. Supp. 2d 1096 (N.D. Iowa 2006), and *Pfluger v. U.S. Group Long-Term Disability Insurance Plan No. 505*, No. 03-C-0710, 2007 WL 130193 (E.D. Wis. Jan. 16, 2007), Rose argues that objective evidence of functionality is not necessary because chronic fatigue syndrome and fibromyalgia are not capable of being objectively analyzed. Indeed, in both *Pfluger* and *Torgeson*, the district courts rejected the insurers' demands for objective evidence of functional limitations resulting from the claimants' conditions. *Torgeson*, 466 F. Supp. 2d at 1131; *Pfluger*, 2007 WL 130193, at *14.

16

However, the case law of this court, to which this panel must adhere, suggests that it is entirely reasonable for an insurer to request objective evidence of a claimant's functional capacity. This court has held that "[r]equiring a claimant to provide objective medical evidence of disability is not irrational or unreasonable." *Cooper*, 486 F.3d at 166 (citing *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 361 (6th Cir. 2002)). In *Cooper*, the court noted that objective medical evidence of the functional capacity of the claimant, who had a lower back injury, would have assisted the insurer in determining whether the claimant was capable of performing the duties of her occupation, as was required by her policy. *Id.*; *see also Oody v. Kimberly-Clark Corp. Pension Plan*, 215 F. App'x 447, 452 (6th Cir. 2007) (holding that denial of disability benefits was not arbitrary and capricious where claimant "failed to submit sufficient objective evidence to establish he was permanently and totally disabled, as defined by the Plan"); *Nichols v. Unum Life Ins. Co. of Am.*, 192 F. App'x 498, 504 (6th Cir. 2006) (determining that insurer was not unreasonable in concluding that treating physician's assessment was "largely based on her acceptance of [the claimant's] descriptions of her medical conditions, rather than based on an objective assessment of [the claimant's] medical history"). While it would have been unreasonable for Continental to request objective evidence of fibromyalgia and chronic fatigue syndrome—conditions that are diagnosed through an evaluation of an individual's subjective complaints of pain—Continental did not require such evidence. Rather, Continental based its decision on the lack of objective evidence of the effect Rose's conditions had on her functional capacity. *Cf. Boardman*, 337 F.3d at 17 n.5. Given this court's case law, as well as the persuasive reasoning of the First Circuit in *Boardman*, Continental did not act arbitrarily in doing so.

F.

17

Rose briefly contends that Continental's decision to terminate her benefits was unreasonable given that she had been receiving benefits for eleven years and there was no evidence of a change in her condition that would have prompted a termination of benefits. As Continental notes, however, no right to receive long-term benefits indefinitely accrued to Rose upon Continental's initial determination that she was entitled to such benefits. *See Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 274 (5th Cir. 2004). As the Fifth Circuit has noted, it would be illogical to prohibit an insurer from ever revisiting an insured's claim, particularly in light of newly discovered evidence calling into doubt an insured's disability. *Id.* Indeed, such a rule might discourage insurers from promptly granting benefits in the first place. *Id.* Thus, to the extent that Rose contends that Continental's termination of benefits eleven years after its initial grant of benefits renders its decision arbitrary and capricious, we find this argument to be unpersuasive.

IV.

For the foregoing reasons, we affirm the judgment of the district court.