WAVERLY D. CRENSHAW, JR., CHIEF UNITED STATES DISTRICT JUDGE
This diversity action is brought by Dr. Barbara Nylander against Unum Life Insurance Company of America ("Unum") and Paul Revere Life Insurance Company ("Paul Revere"). The case arises from the denial of Dr. Nylander's claims for disability insurance benefits under three policies issued by Unum and Paul Revere. Dr. Nylander brings claims under Tennessee law for breach of contract and bad faith denial of insurance benefits. Unum and Paul Revere have filed a Motion for Summary Judgment. (Doc. No. 35.) The motion is fully briefed and ready for decision. For the following reasons, the Court will grant the motion in part and deny the motion in part.
I. Background and Facts [1]
Dr. Nylander is a board-certified medical doctor who maintains a practice in gynecology and gynecological surgery.[2] (Doc. Nos. 1 at ¶ 6; 40-5 at 3.) Plaintiff maintains privileges at Centennial Hospital and Saint Thomas Midtown Hospital in Nashville, Tennessee. (Doc. No. 38-1 at 158.) Defendants are insurance companies that offer long-term disability insurance policies. (Doc. No. 1 at ¶¶ 7-8.) Dr. Nylander maintains three long-term disability insurance policies with Defendants, two issued by Unum ("Unum-BOE" and "Unum-IDI") and one issued by Paul Revere ("PR-IDI"). (Id.; Doc. Nos. 40-2, 40-3, 40-4.) All three policies are administered by Unum. (Doc. No. 1 at ¶ 9; Doc. Nos. 40-2, 40-3, 40-4.) Dr. Nylander's application for PR-IDI, signed March 11, 1993, listed her "occupation" and "exact duties" as "OB/GYN."[3] (Doc. No. 40-2 at 21.)
Under Unum-IDI and Unum-BOE, Unum "must be given the information which we need to determine if a benefit is payable and how much the benefit should be.... We will not pay benefits until we have sufficient proof of loss. When we have *529 determined that the claim is payable, we will pay according to the [b]enefits provision." (Doc. Nos. 40-2 at 12; 40-3 at 11.) Under PR-IDI, Paul Revere will pay claims "only after [w]e receive satisfactory written proof of loss." (Doc. No. 40-4 at 17.)
Unum-IDI and Unum-BOE each define total and residual disability in terms of "material and substantial duties." Total disability is defined in these policies as follows: "Injury or sickness restricts the Insured's ability to perform the material and substantial duties of [her] regular occupation to an extent that prevents [her] from engaging in [her] regular occupation." (Doc. Nos. 40-2 at 6; 40-3 at 7.) Residual disability is defined in these policies as follows: "Injury or sickness does not prevent the Insured from engaging in [her] regular occupation, BUT does restrict [her] ability to perform the material and substantial duties of [her] regular occupation (a) for as long a time as [she] customarily performed them before the injury or sickness; or (b) as effectively as [she] customarily performed them before the injury or sickness." (Doc. Nos. 40-2 at 6; 40-3 at 7.) Finally, these policies define "regular occupation" as "the Insured's occupation at the time the Elimination Period begins. If the Insured engages primarily in a professionally recognized specialty at that time, [her] occupation is that specialty."[4] (Doc. Nos. 40-2 at 6; 40-3 at 6.) PR-IDI defines total and residual disability in terms of "important duties." Specifically, the policy defines total disability as follows: "Because of injury or sickness ... you are unable to perform the important duties of Your Occupation." (Doc. No. 40-4 at 7.) The policy defines residual disability, in relevant part: "Due to injury or sickness which begins prior to age 65, (1) you are unable to perform one or more of the important duties of Your Occupation; or (2) you are unable to perform the important duties of Your Occupation for more than 80% of the time normally required to perform them and ... (c) you are not totally disabled." (Id. at 8.) Finally, the policy defines "Your Occupation" as "the occupation or occupations in which [y]ou are regularly engaged at the time [d]isability begins." (Id. at 7.) Both Unum-IDI and PR-IDI contain a lifetime benefit rider wherein if Dr. Nylander is totally disabled due to injury prior to reaching the age of 65, she will continue to receive total disability benefits for her lifetime so long as she remains totally disabled. (Doc. Nos. 40-2 at 16; 40-4 at 22.)
On April 15, 2015, Dr. Nylander sustained an injury to her right index finger when her partner and husband, Dr. Carl Wingo ("Dr. Wingo"), accidentally cut her during a hysterectomy surgery. (Doc. No. 40-1 at 18-21.) Dr. Nylander had orthopedic surgery the next day to repair a "full rupture with retraction" of the tendon on that finger. (Id. at 56-57; Doc. No. 40-26 at 44.) As Dr. Jason Haslam, Dr. Nylander's orthopedic surgeon explained it: "Tendons are like ropes. And her rope was completely cut." (Doc. No. 40-26 at 7.)
On April 21, 2015, Dr. Nylander submitted her claim for disability benefits under Unum-BOE, Unum-IDI and PR-IDI. (Doc. No. 40-5.) The claim form, which was prepared both by Dr. Nylander and her office manager of approximately 20 years, Carolyn Kelly, identified Dr. Nylander's job title as "medical doctor" and listed her occupational duties as "physician/medical doctor/surgeon." (Id. at 1.) Dr. Nylander further described her specialty as "gynecology" with particular duties as: "performs annual exams which *530 include breast exams and pap smears ; surgeries both minor and major procedures." (Id. at 1, 8.) The claim form noted that Dr. Nylander's occupation required "suturing following surgery." (Id. at 2.) The claim form stated that Dr. Nylander spent 32 hours per week at her job, with 24 of those hours spent, on average, in the office and 6-8 hours spent at the hospital. (Id. at 1, 8.) Dr. Nylander apportioned her duties as 75% office time, 0% administrative tasks, 5% hospital rounds, and 25% surgery.[5] (Id. at 8.) In addition to other office staff, Dr. Nylander stated that her practice employed a "surgery scheduler." (Id. at 9.)
On April 24, 2015, Dr. Haslam released Dr. Nylander to return to limited work duty activities. (Doc. No. 40-25 at 11.) He felt that it would probably be appropriate for Dr. Nylander to see patients for "office visits," as long as she did not use her splinted right hand. (Id. ) On June 12, 2015, Dr. Nylander reported stiffness and discomfort in her finger to Dr. Haslam. (Doc. No. 40-26 at 9.) However, Dr. Haslam released Dr. Nylander to resume work activities with no restrictions. (Id. ) At a follow-up examination on July 24, 2015, Dr. Nylander reported continued discomfort with her hand over the knuckle of her right index finger and stated that heavy gripping aggravated significant discomfort. (Id. at 13-14.) However, Dr. Nylander did not discuss with Dr. Haslam what level of finger functionality she needed for surgery at that time. (Doc. No. 47-5 at ¶ 3.) Dr. Haslam again released Dr. Nylander to resume regular work duty activities with no restrictions. (Doc. No. 40-1 at 66.)
In late July 2015, Dr. Nylander reported to Defendants that she was performing surgeries but that Dr. Wingo was "helping her." (Doc. Nos. 38-31 at ¶ 5; 38-33.) Soon after, the parties agreed Defendants would pay Dr. Nylander's claim for total disability benefits under all three policies, beginning on April 15, 2015, less the elimination period set forth in the three policies, through October 15, 2015, which was the date by which Dr. Nylander expected to return to work full time, performing all duties, including all surgeries, and at full pay. (Doc. Nos. 38-1 at 136-37, 142; 38-31 at ¶ 6; 38-34.) The parties also agreed that Dr. Nylander's premium payments would be waived through the October 15, 2015 date. (Id. )
On September 11, 2015, Dr. Nylander reported continued discomfort to Dr. Haslam, and other "severe difficulties" including problems "us[ing] a knife to cut food." (Doc. No. 40-26 at 14-15.) Dr. Haslam found that Dr. Nylander had stiffness and range of motion deficits in her right index finger. (Id. at 17-18.) On September 13, 2015, Dr. Haslam assessed an impairment rating of 7% to Dr. Nylander's right index finger. (Id. at 18-19.) However, Dr. Haslam released Dr. Nylander with no restrictions. (Id. at 19.)
Shortly thereafter, Dr. Nylander was performing a solo vaginal laparoscopic hysterectomy. In the process of removing the patient's uterus, a "bleeder" occurred. In Dr. Nylander's own words:
A: During the vaginal portion of the case there was a rather large bleeding vessel on the right side of the patient's pelvis after the uterus had been removed and I was temporarily unable to gain control of that, and it took much longer than usual to gain control of the bleeding vessel to get it sufficiently clamped and then to make a suture ligature around it to hold it tight. It was difficult. I think at that moment I realized I really cannot be the surgeon in the lead anymore.
*531 Q. And what would be the process you would go through to try to get the bleeding under control?
A. I mean, it was suction, visualization, placing a clamp, and then placing the suture.
(Doc. No. 40-1 at 80.) On September 14, 2015, Dr. Nylander left a voice mail with Defendants saying that she could not do surgeries anymore because she could not tie a knot. (Id. at 81-82; Doc. No. 38-31 at ¶ 7; Doc. No. 38-35.) Two days later, Defendants' representative spoke to Dr. Nylander, who repeated that, due to her inability to tie knots, she may be able to assist in surgery but she would not be able to continue to work as a lead/solo surgeon-i.e., she would only be able to perform "procedures such as pap smears" in the office. (Doc. Nos. 38-31 at ¶ 7; 38-35.)
Dr. Nylander reported to Dr. Haslam "an inability to perform surgical duties safely." (Doc. No. 40-25 at 27.) In part because Dr. Haslam had concluded "there was no further treatment available," he ordered a Functional Capacity Evaluation ("FCE") so that he could "understand more fully what [Dr. Nylander] could and could not do." (Doc. No. 40-26 at 21.) According to Dr. Haslam, "[FCEs are] accepted by orthopedic doctors [as] a good way, a sound way to measure functional capacity, or the loss thereof" and are "as objective [observations] as we have." (Id. at 21-22.)
In early October 2015, Jeffrey Gandy, a board-certified hand therapist and occupational therapist with twenty years of experience, performed the four-hour long FCE. (Id.; Doc. No. 47-1 at 5-7.) Mr. Gandy noted in his FCE that Plaintiff is an "OBGYN (for 25 years/N/A months)," but she did not provide Mr. Gandy with a job description. (Doc. No. 40-27 at 1, 4.) However, Gandy noted that Dr. Nylander described a typical surgery day as starting at 7:30 a.m. and being made up of "3-5 cases during the morning and 3-4 smaller [ ] cases in the afternoon." (Id. at 4.) Dr. Nylander further reported to Gandy that she would typically have to place "at least 30-40 sutures per surgery." (Id. at 7.) Gandy found that Dr. Nylander's right hand had gross grasp/pinch weakness compared to the left hand, and he observed Dr. Nylander's difficulty performing various suture techniques including "speed/ease" and "pushing suture into tissue." (Id. at 1.) Gandy also observed Dr. Nylander having difficulty handling surgical tools. (Id. ) Dr. Nylander exhibited pain in her right hand throughout the testing. (Id. at 1, 6-7.) Aside from any hand limitations, Gandy deemed Dr. Nylander capable of engaging in medium physical demand level work. (Id. )
Following the FCE, on October 23, 2015, Dr. Nylander had an office visit with Dr. Haslam. (Doc. No. 40-1 at 73.) Dr. Nylander conveyed her ongoing complaints about problems with gripping and suturing in the operating room. (Id. ) According to Dr. Haslam, Dr. Nylander stated that using instruments in the operating room, suture activity, and holding pressure for bleeding seemed to aggravate discomfort around the area of her index finger, and that this specifically included doing surgery. (Id. at 73; Doc. No. 40-26 at 22.) Dr, Haslam noted that Dr. Nylander was "very concerned that she may harm patients during surgery given her ongoing problems and difficulty with gripping, using instruments, suturing, holding pressure on wounds for bleeding." (Doc. Nos. 40-1 at 75; 40-26 at 22.) Dr. Haslam relied on the FCE conclusions.[6] (Doc. No. 40-26 at 21.) Based upon a "combination of [Dr.
*532 Nylander's] subjective complaints and the [FCE]," Dr. Haslam instituted permanent work restrictions such that Dr. Nylander could not engage in heavy gripping and could not suture in the operating room. (Id. at 21, 24-25.) He further instructed Dr. Nylander to avoid instruments that aggravate her right index finger. (Doc. No. 40-1 at 76.) Dr. Haslam took these actions in part out of concern for the safety of Dr. Nylander's patients. (Doc. No. 40-26 at 24.)
On November 4, 2015, Dr. Nylander re-instituted a claim for disability benefits under her three policies with Defendants. (Doc. Nos. 40-1 at 135; 38-31 at ¶¶ 8-9; 38-37.) In this claim form, Dr. Nylander stated that she had returned to work, but was only able to perform the following duties of her occupation: "office based practice/exams/minor procedures." (Doc. No. 38-37 at 1.) She stated that she was unable to perform "surgery-unable to tie knots/use finger for manual dissection/unable to use equipment." (Id. ) That claim form also contains an Attending Physician's Statement, signed by Dr. Haslam, indicating that Dr. Nylander is restricted as follows: "No heavy gripping. No suturing in the operating room, and instruments which aggravate index finger MCP joint pain. Right finger." (Id. at 5.)
In reviewing Dr. Nylander's claim for additional benefits, Defendants spoke with Ms. Kelly and Dr. Nylander on multiple occasions; gathered and reviewed relevant medical records from Dr. Nylander's medical providers, including Dr. Haslam; gathered and reviewed relevant practice records, reviewed billing records by CPT code;[7] and contracted for a medical exam ("IME") by Dr. David Martin, a board certified surgeon with certifications in hand and upper extremity conditions. (Doc. No. 38-31 at ¶¶ 7-11 and exhibits cited therein.) Defendants did not select a gynecologist to review Dr. Nylander's claim file because they "didn't feel it was necessary, nor did they consult with anyone other than Dr. Nylander regarding the important duties of a gynecologist and/or surgeon. (Doc. No. 47-3 at 42, 133.)
Dr. Martin completed the IME in approximately one-half hour. (Doc. No. 38-30 at 13.) In the IME, Dr. Martin opined:
[T]here is no reason that the time she devotes to the practice of medicine should be restricted. With regard to her hand, she is physically capable of working a full-time practice schedule. With regard to the limitation of her index finger, I would not recommend instituting any permanent work restrictions. It is my opinion that work restrictions are utilized to prevent additional injury or harm to the patient; she is unlikely to cause any injury or damage to her hand or finger as a result of any activity whatsoever. Continuing to participate in operative gynecological surgery, she has likely maintained the competence and technical proficiency to perform surgeries and, with reasonable accommodations, could likely return to performance of surgery it desired.
(Id. ) One of the "accommodations" that Dr. Martin suggested to Dr. Nylander was wearing oversized gloves during surgery. (Doc. No. 38-1 at 148.) Dr. Nylander found this suggestion "possibly ludicrous."[8] (Id. )
*533 In his deposition, Dr. Martin testified that he found nothing that would prohibit Dr. Nylander from performing the full scope of her practice, including surgical duties. (Doc. No. 40-29 at 30.) He stated that Dr. Nylander's struggle with her finger would "not necessarily" impede her ability to manipulate surgical tools, and that Dr. Nylander might be able to use "other digits", "other techniques of operating these instruments," or "surgical assistants." (Id. at 31.) However, Dr. Martin noted that the safety of surgical patients is a "very sober and important issue" and that "surgeons must be the ones to determine what procedures they can perform safely and comfortably, satisfactorily without endangering their patients." (Id. at 32.) Dr. Martin further testified that Dr. Nylander "appeared to be very honest in her description of the limitations she had," and that, even though he disagreed, he had "no specific criticisms" of the restrictions imposed on Dr. Nylander by Dr. Haslam. (Doc. No. 40-29 at 25, 60.) Defendants never conducted an analysis of whether Dr. Nylander would be totally disabled if she could not perform surgery, because they "concluded she could perform surgery." (Doc. No. 47-3 at 125.)
On March 30, 2016, relying in part on Dr. Martin's IME and the review of records by Dr. Groves and Dr. Saks, Defendants denied Dr. Nylander's claim for additional disability benefits. (Doc. Nos. 38-31 at ¶ 13; 38-41.) Melissa Walsh, Defendants' corporate representative, testified that at the time of this denial Defendants "didn't make any sort of determination that [Dr. Nylander] was engaged in her occupation." (Doc. No. 4703 at 50-51.) On April 29, 2016, Dr. Nylander submitted an appeal of Defendants' decision to deny her claim for additional benefits. (Doc. Nos. 38-31 at ¶ 14; 38-42.) She claimed in the letter that she was totally disabled under the policies. (Doc. No. 38-42.) Dr. Nylander further advised Defendants in writing that if she was not paid the additional total disability benefits, she would pursue bad faith penalties pursuant to Tenn. Code Ann. § 56-7-105. (Doc. Nos. 38-31 at ¶ 15; 38-43.) On May 4, 2016, Dr. Nylander was notified of Defendants' intent to complete the review of her appeal "as soon as possible." (Doc. Nos. 38-31 at ¶ 16; 38-44.) In evaluating the appeal, Defendants consulted in-house doctors Dr. John Groves and Dr. Joel Saks; asked follow-up questions of Dr. Martin; and consulted Andrea Coraccio, an in-house vocational rehabilitation expert. (Doc. Nos. 38-31 at ¶ 18; 38-46, 38-47.)
On June 30, 2016, fifty-five days after receipt of the bad-faith letter, Defendants affirmed their denial of additional benefits. (Doc. Nos. 38-31 at ¶ 17; 38-45.) Dr. Nylander and Kelly both testified that, aside from the retrospective belief that that Defendants' representatives were gathering information for the purposes of eventually denying the claim, Defendants did not mislead them, provide them with inaccurate information, or unnecessarily delay the claims process. ( (Doc. Nos. 40-1 at 138-153; 40-16 at 104-106.) Indeed, Dr. Nylander testified that the Defendants' claims representative, Matthew LaRotonda was "agreeable" and "acted as if he were [her] friend." (Doc. No. 38-1 at 138.)
Dr. Nylander states that she has not recovered from her injury-namely, not being able to achieve full flexion, lacking grip strength, pinch strength and dexterity. (Doc. No. 47-5 at ¶ 6.) According to Dr. Nylander, this lingering injury prevents her from (1) suturing in pelvic and abdominal cavities, (2) adequately handling her surgical tools and the trigger devices of her surgical tools, and (3) being able to apply adequate pressure to tissue, veins, and arteries during surgery in some circumstances. (Id. ) As a result, Dr. Nylander does not believe that she is able to work as *534 a lead surgeon on invasive gynecological procedures without putting her patients at risk of "substantial and long-term injuries and disabilities." (Id. )
Walsh testified that "what Unum has stated is that as a gynecologist [Dr. Nylander] performed surgeries." (Doc. No. 47-3 at 89-90.) She testified that Dr. Nylander's surgical duties and clinical duties were all "material and substantial." (Id. at 88-89.) Stated differently, according to Walsh, Defendants "didn't come out and say that any of these duties wouldn't have been material and substantial." (Id. at 89.) However, later in her deposition, Walsh reversed course and stated that "everything was looked at and [Defendants] concluded surgery wasn't an important duty of [Dr. Nylander's] occupation." (Id. at 116.) Then Walsh admitted that she "wasn't sure" whether Defendants had given more importance in their analysis to the number of procedures Dr. Nylander performed or the income those procedures generated when determining what was important/material and substantial. (Id. at 116-117.)
Dr. Nylander worked on numerous major, invasive surgical procedures before her injury, and she considers these surgical duties to be important/material and substantial aspects of her regular occupation. (Doc. Nos. 47-5 at ¶¶ 7-8, 11, 14-15; 38-1 at 82-91.) These duties include: (1) hysteroscopy with endometrial ablation and dilation and curettage ; (2) hysteroscopy, surgical, with sampling; (3) laparoscopic assisted vaginal hysterectomy (LAVH); (4) surgical laparoscopy, with fulguration or excision of lesions; (5) surgical laparoscopy, with lysis of adhesions; (6) laparoscopy, with removal of adnexal structures; (7) removal of prosthetic vaginal graft; (8) repair of pelvic floor defect using mesh by vaginal approach; (9) abdominal hysterectomy ; (10) vaginal repair, and (11) myomectomy. (Doc. Nos. 47-6; 38-1 at 82-91.) Since her injury, Dr. Nylander has not led or performed solo the majority of these procedures.[9] (Doc. Nos. 38-1 at 82-91; 47-5 at ¶ 16.) For the several years prior to Dr. Nylander's injury, surgery comprised 20-25% of Dr. Nylander's actual time, between 5-9% of her CPT billing codes, but made up 40-50% of her practice revenues. (Doc. Nos. 40-15 at 39-41; 40-5 at 8.)
After her injury, Dr. Nylander has continued to engage in other practice tasks, including clinical tasks and assisting with surgery. These duties included: (1) patient consultations and physical examinations; (2) pap smears and other tissue sampling for testing; (3) certain biopsies; (4) ordering of lab tests and interpreting results; (5) certain dilation and curettage procedures ; (6) colposcopic procedures ; (7) hysteroscopic procedures; (8) incision and drainage of vulvar abscesses ; (9) LLETZ loop of the cervix; (10) vaginal atrophy procedures, including use of the "Mona Lisa Touch" laser; (11) non-surgical fertility treatments and counseling; (12) insertion and removal of IUDs; (13) birth control treatment and counseling; and (14) serving as an assistant surgeon for certain procedures. (Doc. Nos. 40-1 at 39-40, 44, 46, 48-51, 82-93, 99-110.) An assistant surgeon provides minor services such as suction and clamping, and is typically reimbursed at only 20% of the rate of a lead surgeon.
*535 (Doc. No. 40-15 at 34-35.) Dr. Nylander is no longer able to serve as her husband's assistant surgeon as of 2018 because, for economic purposes, Dr. Wingo has shifted that role to personnel without a medical degree.[10] (Doc. No. 47-5 at ¶ 27.)
Dr. Nylander's gross income has significantly decreased since her injury after she stopped billing for lead surgical procedures:
2014: $292,190
2015: $262,997
2016: $117,500
2017: $158,860.26 (through October 2017)[11]
(Doc. Nos. 38-8; 38-9; 40-1 at 113-116.) Dr. Nylander avers that her injury has resulted not only in the loss of her ability to perform as a lead surgeon, but in losses for all other parts of her practice. (Doc. No. 47-5 at ¶ 29.) More specifically, Dr. Nylander's inability to act as lead surgeon in major gynecological procedures has reduced (and will continue to reduce) her clinical practice because "[g]ynecological patients expect a continuum of care from their gynecologists. Patients expect that the gynecologist who evaluates them during an office visit will be the same gynecologist who serves as their lead surgeon during a procedure. As a result, patients, and their referring doctors, are unlikely to choose gynecologists who cannot perform as a lead surgeon." (Doc. No. 47-5 at ¶ 9.) Dr. Nylander has stated that she is "unaware of any gynecologist who practices in Nashville who maintains only a clinical practice" and she "estimate[s] that less than five percent of all physicians who practice as gynecologists in the United States have only clinical practices. The reason for that is that it is not possible to maintain a strictly clinical practice that generates close to the revenue that a surgical and clinical practice generates."[12]
*536 (Id. at ¶ 10.) Accordingly, Dr. Nylander maintains that "referrals from other physicians have been gradually tapering off as more and more learn that [she is] unable to handle major gynecological procedures." (Id. at ¶ 19.) In addition, "surgical consultations and post-surgical follow-up visits make up a significant portion of [Dr. Nylander's] clinical practice." (Id. at ¶ 13.) For these among other reasons, Dr. Nylander states that her "ability to perform invasive, gynecological surgeries as a lead surgeon was an essential part of [her] practice; that ability drove [her] clinical practice and was directly and indirectly the source of a substantial portion of [her] income as a gynecologist." (Id. at ¶ 11.) Dr. Nylander is now being paid $60.00 per hour for clinical work instead of receiving a "practice draw"; she has stated that she expects her 2018 practice income to further decrease to an estimated $94,000 per year, two-thirds less than before her injury. (Id. at ¶ 28.)
II. Legal Standard
In reviewing a motion for summary judgment, this Court will only consider the narrow question of whether there are "genuine issues as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A motion for summary judgment requires that the Court view the "inferences to be drawn from the underlying facts ... in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) ). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). After the movant has satisfied this initial burden, the nonmoving party has the burden of showing that a "rational trier of fact [could] find for the non-moving party [or] that there is a 'genuine issue for trial.' " Matsushita, 475 U.S. at 587, 106 S.Ct. 1348. If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 479-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." Hill v. White, 190 F.3d 427, 430 (6th Cir. 1999) (citing Anderson, 477 U.S. at 247-49, 106 S.Ct. 2505 ).
III. Analysis
A. Objective Evidence
Defendants contend that Dr. Nylander did not submit sufficient "objective evidence" to satisfy the "proof of loss" requirements in the policies. (Doc. No. 36 at 11-15.) More specifically, Defendants argue that: (1) Dr. Haslam initially cleared Dr. Nylander to return to work with no restrictions, (2) Dr. Nylander's subsequent complaints to Dr. Haslam were subjective in nature, (3) Mr. Gandy's FCE was unconvincing and Dr. Haslam only reviewed its summary (as opposed to every detail of its testing results), and (4) Dr. Martin's IME is objective evidence to the contrary of the FCE and, in the end, the limitations imposed by Dr. Haslam. (Id. )
This argument is without merit. First, Dr. Haslam's initial clearances from Dr. Haslam were made before the extent of the problem performing surgery became evident to Dr. Nylander and was reported to Dr. Haslam. Little importance can reasonably be attached to when Dr. Haslam *537 cleared Dr. Nylander to return to work before she brought her complaints of disability to his attention. Dr. Haslam, a hand surgery expert whose records were provided to Defendants, eventually concluded that Dr. Nylander had a likely-permanent seven-percent deficit in her finger. Second, while Dr. Nylander's complaints may have been generally subjective in nature, she had particularized knowledge from her decades of experience in the practice of gynecology and surgery that reasonably enabled her to evaluate whether her injury affected her ability to manipulate surgical tools and tie sutures (and thereby prevented her from safely performing surgery).
Third, the FCE clearly constituted objective evidence upon which Dr. Haslam could-and did-rely. See Caesar v. Hartford Life & Acc. Ins. Co., 464 Fed.Appx. 431, 435 (6th Cir. 2012) ("An FCE is generally a 'reliable and objective method of gauging the extent one can complete work-related tasks.' ") (citing Huffaker v. Metro. Life Ins. Co., 271 Fed.Appx. 493, 500 (6th Cir. 2008) ); see also, e.g., Brooking v. Hartford Life & Acc. Ins. Co., 167 Fed.Appx. 544, 549 (6th Cir. 2006) (describing an FCE as "objective evidence" of a claimant's back pain). Indeed, Unum's own claims manual states that an FCE is a valid factor to be considered when evaluating a claimant's symptoms, (Doc. No. 44 at 5-6), and Unum has taken the position in federal litigation that FCE results may be relied upon to deny benefits (see Doc. No. 42 at 9 n. 3 (collecting cases) ). In one of those cases from this circuit, Pelchat v. UNUM Life Insurance Company of America, No. 3:02cv7282, 2003 WL 21105075, at *9 (N.D. Ohio Mar. 25, 2003), Unum argued that the only "objective medical evidence" supporting the plaintiff's claim file-an FCE -supported its claims decision. See id. at *10 ("UNUM gives much credence to the FCE. In fact, in UNUM's first denial letter to plaintiff, the FCE is the exclusive reason plaintiff was denied coverage.") There is no evidence that Dr. Nylander in any way manipulated or distorted the FCE results. Indeed, Mr. Gandy conducted numerous repetitive trials and believed that Dr. Nylander was making a good faith effort. (Doc. Nos. 40-27 at 1; 47-1 at 11-12.) Furthermore, that Dr. Haslam reviewed only the FCE summary is of no moment for purposes of this motion. As in the case of many scientific reports, the summary sufficiently explains pages of test result numbers. (See Doc. No. 40-27.) It was perfectly reasonable for Dr. Haslam to rely on Mr. Gandy's interpretation of the underlying results. In sum, the record contains Dr. Haslam's objective records, the objective FCE, and testimony from Dr. Haslam that he relied upon (in addition to Dr. Nylander's subjective complaints) the objective FCE results in formulating his final disability finding and work restrictions for Dr. Nylander. Finally, fourth, whether Dr. Martin's IME contradicts the FCE or Dr. Haslam's final restrictions is certainly irrelevant to the question of whether Dr. Nylander has adduced objective evidence of "proof of loss." This argument merely highlights disputes of material fact about the extent of Dr. Nylander's physical disability.
There is another more general basis for rejecting Defendants' overarching lack of "objective medical evidence" argument: namely, to require Dr. Nylander to prove that she is disabled by "objective medical evidence" would add a new requirement to the definition of "disabled" under the policies. To be totally disabled under Unum-IDI and Unum-BOE, Dr. Nylander must have an "[i]njury or sickness [that] restricts the Insured's ability to perform the material and substantial duties of [her] regular occupation to an extent that prevents [her] from engaging in [her] regular occupation." (Doc. Nos. 40-2 at 6; 40-3 at 7.) There is a parallel definition for residual disability. Further, Dr. Nylander must provide "sufficient proof of loss." (Doc. Nos. 40-2 at 12; 40-3 at 11.) To be totally disabled under PR-IDI, Dr. Nylander must have an "injury or sickness" that renders her "unable to perform the important duties of Your Occupation." (Doc. No. 40-4 at 7.) There is a parallel *538 definition for residual disability. Further, Dr. Nylander must provide "satisfactory written proof of loss." (Doc. No. 40-4 at 17.) These policies do not condition benefits on a certain level of clinical evidence of the existence of the condition that renders a claimant disabled. To construe Dr. Nylander's policies to impose a requirement of "objective medical evidence" would inappropriately rewrite them. See Pelchat, 2003 WL 21105075, at *11.
In support of their arguments, Defendants cite to several cases for the broad principle that Dr. Nylander's subjective complaints are an insufficient basis for disability benefits. These ERISA cases, decided under the arbitrary and capricious standard, are unconvincing. For example, Defendants cite Rose v. Hartford Fin. Servs. Grp., Inc., 268 Fed.Appx. 444, 450 (6th Cir. 2008), for the proposition that a physician's statement that "merely reflects" a patient's subjective complaints is "insufficient to provide objective proof of disability." (Doc. No. 36 at 13.) However, in Rose, the Court of Appeals actually held that the insurance company did not act arbitrarily by denying benefits based on the detailed opinions of several independent medical examiners, where two of the claimant's doctors were "unwilling to comment on her ability to work," and her third, most recently retained doctor offered only a conclusory statement that she could not work and described himself as an "advocate." Id. at 450-51. Rose is not analogous to the instant case. Nor is Judge v. Metro. Life Ins. Co., 710 F.3d 651, 660-61 (6th Cir. 2013), in which the Sixth Circuit upheld a denial of benefits based in part on evidence that the claimant's two doctors had "failed to provide any reasoning to support their inconsistent assessments of [the claimant's] functionality on forms that explicitly invited an explanation." Id. at 651 (emphasis added). Again, this is not the case here, where the rationale of the FCE and Dr. Haslam were set forth. Third, Hogan v. Life Ins. Co. of N. Am., 521 Fed.Appx. 410, 415-17 (6th Cir. 2013), concerns a scenario in which an insurance company was found to have not acted arbitrarily in denying disability benefits to a claimant who raised mental illness as a reason to miss work but had no clinical evidence and only three "brief visit notes" from an internist with no experience in mental health specialization. Again, this is not analogous to the instant case, where Dr. Nylander engaged in an extended course of treatment with Dr. Haslam, a hand surgery specialist, and obtained an FCE at his direction.
Finally, Defendants cite Cooper v. Life Ins. Co. of N. Am., 486 F.3d 157, 166 (6th Cir. 2007), for the very broad proposition that "[a]n insurance company's requirement that there be objective medical evidence of disability is not irrational or unreasonable." Aside from the fact that there is objective evidence in the record here, this holding must be understood in context. In Cooper, the plan at issue allowed the administrator to request "reasonable" documentation of the insured's condition and obligated the insured to comply with such requests. Id. The insurance company requested objective documentation of the insured's functional capacity. The Court of Appeals found that request reasonable, noting that such documentation "would have assisted [the insurer] in determining whether [the insured] was capable of performing 'all the material duties of her Regular Occupation,' as required by the Plan's definition of disability." Id. However, the insured did not provide the requested information.
*539 Id. But documentation of Dr. Nylander's functional capacity-i.e., the FCE , was exactly what she provided to the Defendants here. Moreover, Defendants identified no more "objective" evidence that Dr. Nylander could have submitted, in addition to her doctor's observations and the FCE, to support her claim of disability (nor did Defendants advise Dr. Nylander that her medical evidence was objectively insufficient, as opposed to merely unpersuasive, during the claims process). Id.; see also Pelchat, 2003 WL 21105075, at *11.
For all of these reasons, Defendants are not entitled to summary judgment on this ground.
B. Disability Under the Policies
Defendants next contend that Dr. Nylander is not entitled to "total disability" benefits under the policies because she can still perform some of the "important" or "material and substantial" duties of her occupation. As Dr. Nylander correctly argues in response, Leonor v. Provident Life & Accident Company, 790 F.3d 682 (6th Cir. 2015) governs how the Court evaluates this argument.[13] Specifically, Leonor rejected the "must be unable to perform any important/material and substantial duties" red-line approach advanced by Defendants in favor of the sliding-scale "continuum of disability" rubric put forth by Dr. Nylander.[14] Id. at 691.
In Leonor, the Court of Appeals encountered policy language identical to the "unable to perform the important duties of Your Occupation" language of the PR-IDI policy here. Id. at 684. The court also noted that it did not consider there to be any practical difference between the terms "important" and "material and substantial" (found in Unum-IDI and Unum-BOE here) for purposes of its analysis. Id. at 687 n.3. Dr. Leonor was a dentist who, as a result of an injury, could no longer perform clinical dental services but could still perform dental practice management services. Id. at 683-84. He claimed total disability. Id. at 684. The insurer denied coverage, asserting that he was not totally disabled under the policies because he was still actively involved in his practices and, in fact, his income had increased. Id. The district court noted that a number of federal courts in other states had reached the conclusion that "the important duties" language had necessarily the same meaning as "all the important duties"; however, the *540 district court adopted the analyses of the Eleventh and Eighth Circuits and held that the scope of the phrase "the important duties of Your Occupation" was ambiguous and could plausibly refer to fewer than all of the important duties. Id. at 686.
The Sixth Circuit affirmed, holding that "[t]he policies' definition of Total Disability is ambiguous and can reasonably be understood to cover an injury that prevents the insured from performing most, if not all, of the important duties of her pre-injury occupation." Id. at 687. Thus, for a claimant in this circumstance to prevail at summary judgment, "his interpretation [of "important duties"] must be reasonable, but it need not be superior to the insurers.' " Id. Importantly, the Court stated as follows:
In the context of disability insurance, reading "unable to perform the important duties of Your Occupation" to refer to each and every important duty does not serve any apparent purpose of the parties. A person is unemployable in a particular profession so long as she cannot perform a substantial proportion of that profession's important duties. At that point, it does not matter whether there are a few important duties that she can perform, because she will still be unable to function in that profession. The insurers' proposed interpretation appears disconnected from the risk insured against-the possibility that injury will force the insured to quit his occupation. This analysis justifies the approach of the Eighth Circuit (applying Minnesota law) and the Eleventh Circuit (applying Georgia law). Those courts have held that " 'most' or the 'majority' of the [important] duties is ... a reasonable interpretation if an insured is unable to engage in his regular occupation as a result of his inability to perform most or the majority of those duties." Giddens v. Equitable Life Assur. Soc. of U.S., 445 F.3d 1286, 1298 (11th Cir. 2006) ; Dowdle v. Nat'l Life Ins. Co., 407 F.3d 967, 968, 970 (8th Cir. 2005).
Id. at 690. The Court concluded that Leonor was "unable to perform the important duties of [his] Occupation" because he was no longer engaged in an occupation "closely resembling" his prior one. Id. Notably, the Court found that "the bar for residual disability is low; one must be unable to perform "one or more" important duty," and that "[t]his suggests that the boundary with total disability must be significantly further along on the disability continuum, but it does not suggest exactly where it should be." Id. at 691. "At most, the residual-disability definition rules out interpretations of "the important duties" in which that phrase refers to only a few of the important duties rather than a substantial number or proportion of them. But all that is required to avoid this is that the dividing line between total disability and residual disability leave significant space on the disability continuum for non-total, residual disability. Something along the lines of "most important duties" does this comfortably." Id. That being said, the Court of Appeals (1) also noted that an important factor might be when "the overall character of [a claimant's] income-earning activities change[s] dramatically after his injury," and (2) explicitly stated that: "[t]ime spent is not necessarily the only consideration. For some occupations, a few activities that do not take up very much time might be so exceedingly important that they determine an individual's ability to engage in the occupation. " Id. at 692 (emphasis added). Notably, the Court concluded that Leonor was totally disabled, even though he engaged in the lucrative "side-operation" of dental practice management after his injury. Id.
As noted, the Sixth Circuit relied upon Dowdle and Giddens in reaching this conclusion. In Dowdle, the Eighth Circuit applied Minnesota law to insurance policies defining total disability as inability "to perform *541 the material and substantial duties of an occupation." Dowdle, 407 F.3d at 970. The court found that ambiguity existed because "[t]he policies' definitions of 'total disability' are susceptible to differing interpretations, because the policies do not speak in terms of 'any,' 'all,' 'some,' or 'the most important part' of [the insured's] duties." Id. The court concluded that a surgeon who could no longer stand long enough to perform orthopedic surgery but could "conduct office practice," see patients, read x-rays, perform IMEs, interpret data, and promote referrals was totally-not residually-disabled because he could not perform "the most important substantial and material duty" of his occupation. Id. at 972. In Giddens, the Eleventh Circuit likewise considered insurance policies defining total disability in the context of "engag[ing] in the substantial and material duties of your regular occupation." 445 F.3d at 1297. Giddens was a real estate developer who had a liver transplant. He submitted an affidavit describing the functional requirements and tasks of his occupation as:
entrepreneurial vision and energy; planning real estate projects; selection of house plans and materials; selection of contractors; supervision of construction superintendent(s); periodic inspection of contractors' work quality; financial management of development and construction projects; supervise compliance with building and other regulatory codes; project scheduling; pay bills; pay contractors; work with banks, government agencies, and financial consultants as needed; calculating the feasibility of projects, reviewing sites, and planning for contingencies; and coordination [of] dealings with realtors and agents.
445 F.3d at 1289. The court found that these duties were "basically entrepreneurial, financial, planning, coordinating, and administrative duties" and that these were the "material and substantial" duties of his real estate occupation. Id. at 1293. The court found that Giddens could not perform "entrepreneurial vision and energy, higher-level planning of real estate development projects, financial management of development and construction projects, and determining the feasibility of projects," but could perform "selecting house plans, materials, and contractors," and that this meant he could not perform "most" of the substantial, material duties of real estate development. Id. at 1297-98. The court therefore concluded Giddens was totally disabled under his policies because he was unable to perform the duties "at the heart" of his occupation.[15] ibr.US_Case_Law.Schema.Case_Body:v1">See id.
Taking all inferences in Dr. Nylander's favor, the Court must, then, consider what Dr. Nylander's important/material and substantial duties are as a gynecologist and surgeon, and to what degree Dr. Nylander's disability has prevented her from engaging in those duties. Defendants' corporate representative testified that Dr. Nylander's surgical duties and clinical (i.e., office) duties were all material and substantial.[16] (Id. at 88-89.) Dr. Nylander has *542 taken the position that her ability as lead surgeon was the "heart" of her practice, it drove her clinical practice and was directly and indirectly the source of a substantial portion of her income as a gynecologist. Evidence in this case establishes that, until her injury in 2015, Dr. Nylander's practice consisted of 75% office consultations and minor office procedures and 20-25% assistant and lead surgical procedures. While the surgical procedures averaged 5-9% of Dr. Nylander's CPT billing codes, they generated 40-50% of her income. After her injury, primarily from 2016-2017, Dr. Nylander's practice consisted of office consultations, minor office procedures, and sometimes assisting Dr. Wingo with surgery. As of 2018, Dr. Nylander's practice will only consist of office consultations and minor office procedures. And there is more: (1) a significant portion of Dr. Nylander's clinical appointments were directly related to surgeries (i.e., pre-and post-operative consultations); (2) Dr. Nylander believes that she has lost existing and prospective patients because she cannot meet patients' preference for a unified provider of both clinical and surgical services; and (3) Dr. Nylander believes that other doctors will now not refer patients to her because she cannot be a lead surgeon. Dr. Nylander knows of very few, if any, existing non-surgical gynecology practices.
The Court acknowledges that Dr. Nylander's scenario is somewhat nuanced and not as straightforward as that in Leonor. Like the claimants in Leonor, Dowdle, and Giddens, it appears clear that Dr. Nylander can still perform some important/material and substantial duties of her occupation (namely office consultations, minor office procedures, etc.). The strongest argument the Defendants have is that the 25% of time that Dr. Nylander spent on surgical duties does not fit "comfortably" along the lines of "most important duties." Leonor, 790 F.3d at 691. Overall, however, the Court concludes that Dr. Nylander's circumstances still fall within the strictures of Leonor, which instructs the Court to strictly construe the policies in favor of the insured and identify what is "at the core" of Dr. Nylander's occupation. Taking all evidence in the light most favorable to Dr. Nylander, the Court finds that she has raised a substantial issue of fact as to whether her ability to lead surgeries formed the heart of her practice. This finding is bolstered by the Court of Appeals' observation that where the "continuum of disability" falls might be affected by a dramatic change in a claimant's income-earning activities after her injury. Dr. Nylander estimates that, by 2018, her income from her gynecological practice is likely to have decreased by two-thirds in only three years. As just one example, in the twelve months prior to her injury, Dr. Nylander earned $84,500 from performing only two kinds of surgical procedures alone; after decades of such work experience, she is now being paid at a rate of $60.00 per hour for work only in her office. This is the type of extreme loss against that a physician would procure total disability insurance.[17] Perhaps even more important in this case is the Sixth Circuit's prescient recognition that "for some occupations, a few activities that do not take up very much time might be so exceedingly important that they determine an individual's *543 ability to engage in the occupation." Id. at 692. As discussed above, Dr. Nylander has adduced competent evidence regarding the outsized impact of surgery on the nature and success of her practice and her ability to successfully engage in that practice after her injury. There are questions of fact as to whether Dr. Nylander's strictly clinical tasks, taken in isolation, will enable her to continue her occupation in a significant manner in the long-term. See, e.g., Giddens, 445 F.3d at 1289 ("Even if Giddens can perform a few substantial and material duties ... his ability to perform those tasks in isolation still would not allow Giddens to continue in his real estate development occupation because he is unable to perform [those duties] ... which were the heart of his real estate occupation."); Dowdle, 407 F.3d at 970 ("[A] determination of total disability does not require "a state of absolute helplessness or inability to perform any task relating to one's employment."); id. at 972 (concluding office clinical practice was not substitute for surgical aspect of practice). Accordingly, under Leonor, genuine issues of material fact exist as to whether lead surgical procedures were an important/material and substantial duty of Dr. Nylander's occupation and the extent of Dr. Nylander's injury on the practice of her occupation. See also, e.g., Matthew v. Unum Life Ins. Co. of Am., Civil No. 08-4610 (DWF/RLE), 2009 WL 3152042, at *5-7 (D. Minn. Sept. 24, 2009) (in case of urologist with arthritis, where (1) there was a dispute as to the extent of claimant's surgical practice and whether he performed enough major surgeries requiring standing for a long period of time to be considered a material and substantial part of occupation, and (2) claimant asserted that ability to perform major surgeries was an essential element of his occupation, finding issues of fact prevailed and denying summary judgment); Morgan v. Unum Life Ins. Co. of Am., No. 2:10-cv-957DN, 2012 WL 3156569, at *2 (D. Utah Aug. 3, 2012) (denying summary judgment where general practice surgeon was limited to office practice, minor office procedures, and at least one major surgery, and concluding that based on the evidence regarding the claimant's material and substantial duties, "a reasonable jury could conclude that he was totally disabled under the Policies as a result of the injury to his left hand").
The court will therefore deny summary judgment on Dr. Nylander's breach of contract claim.
C. Bad Faith
When an insurer refuses to pay a loss in bad faith, the insured may receive up to 25% of the liability in addition to the loss. Tenn. Code Ann. § 56-7-105(a). To state a bad faith claim, a plaintiff must show: (1) the policy of insurance has, by its terms, become due and payable; (2) a formal demand for payment has been made; (3) the insured has waited 60 days after making demand before filing suit (unless there was a refusal to pay prior to the expiration of the 60 days); and (4) the refusal to pay was made in bad faith. Patterson v. Shelter Mut. Ins. Co., No. M201401675COAR9CV, 2015 WL 5320231, at *7 (Tenn. Ct. App. Sept. 11, 2015). At trial, plaintiff would bear the burden of proving that Defendants refused to pay in bad faith. Williamson v. Aetna Life Ins. Co., 481 F.3d 369, 378 (6th Cir. 2007).[18]
*544 A bad faith claim for a refusal to pay cannot be sustained "when the insurer's refusal to pay rests on legitimate and substantial legal grounds." Tyber v. Great Cent. Ins. Co., 572 F.2d 562, 564 (6th Cir. 1978) ; accord Williamson, 481 F.3d at 378 ; Lance v. Owner's Ins. Co., No. E2015-00274, 2016 WL 3092818, at *13 (Tenn. Ct. App. May 25, 2016) ; Ginn v. Am. Heritage Life Ins. Co., 173 S.W.3d 433, 443 (Tenn. Ct. App. 2004). An investigation can be a legitimate ground for refusal. Bowery v. Berkshire Life Ins. Co. of Am., No. 3:11-CV-03, 2013 WL 1497339, at *10 (E.D. Tenn. Apr. 11, 2013) (finding insurer did not act in bad faith because it conducted a thorough investigation over a period of seven months). "Ordinary care and diligence in the investigation require that the insurer investigate the claim to such an extent that it can render honest judgment regarding whether the claim should be settled." Fox v. Massachusetts Bay Ins. Co., No. 2:13-CV-2567-JTF-DKV, 2015 WL 10791983, at *5 (W.D. Tenn. Feb. 23, 2015). The insurer's reliance on the investigation should also be reasonable. Klink v. Grange Ins., No. 1:12-CV-159, 2014 WL 11532237, at *6 (E.D. Tenn. July 30, 2014) (leaving to jury the issue of bad faith because insurer was on notice that reliance on its investigation might be unreasonable after insured's letter outlining deficiencies in investigation report). "[A]n insurer's mistaken judgment is not bad faith if it was made honestly and followed an investigation performed with ordinary care and diligence." Johnson, 205 S.W.3d at 371. "Mere negligence is not sufficient to impose liability for failure to settle." Id. (citing S. Fire & Cas. Co. v. Norris, 35 Tenn.App. 657, 250 S.W.2d 785, 790-92 (1952) ). "The question of an insurance company's bad faith is for the jury if from all of the evidence it appears that there is a reasonable basis for disagreement among reasonable minds as to the bad faith of the insurance company in the handling of the claim." Id.
Defendants seek summary judgment on Dr. Nylander's bad faith claim under § 56-7-105. Defendants argue that their denial of Dr. Nylander's disability insurance claim was "thoroughly reviewed by medical professionals and well-reasoned." (Doc. No. 36 at 24.) Defendants state that they relied upon (1) the IME and opinion of Dr. Martin; (2) the medical reviews by Dr. Groves and Dr. Saks; (3) the communications with Dr. Nylander; (4) the fact that Dr. Nylander was originally cleared to return to work by Dr. Haslam before he imposed work restrictions; and (5) the fact that "[Dr. Nylander] never submitted documentation in support of a residual disability claim." (Id. ) In response, Dr. Nylander argues that Defendants acted in bad faith by (1) utilizing Dr. Martin, who (a) has never been a part of a gynecological practice or involved in gynecological surgery, (b) did not take any steps to determine the amount of flexion or pressure Dr. Nylander needed to use any of her surgical instruments, and (c) had no expertise to determine if Dr. Nylander could return to her surgical duties; (2) "didn't feel it was necessary" to hire a gynecologist to determine how Dr. Nylander's limitation would affect her practice, nor consult with a gynecologist regarding the important duties of a gynecological practice; (3) did not perform a systemic analysis of Dr. Nylander's income that was promised; and (4) reached inappropriate and conflicting conclusions regarding the important aspects of Dr. Nylander's practice. (Doc. No. 42 at 23-25.)
After considering these arguments and all the evidence of record discussed above, the Court finds that there were reasonable bases for controversy in determining whether Dr. Nylander was entitled to the claimed disability benefits. Defendants' denials were based upon arguably legitimate grounds under the terms of *545 the policies. While Dr. Nylander has advanced the argument that the Defendants' investigation was insufficient or in the end substantively misguided, she has not, as is her burden, put forth evidence to demonstrate that it was somehow unreasonable, dishonest, negligently protracted, or fundamentally illegitimate. See, e.g., Lance v. Owner's Ins. Co., No. E2015-00274, 2016 WL 3092818 (Tenn. Ct. App. 2016) (trial court erred in submitting bad faith claim to jury where, in part, the record reflected that defendant promptly began an investigation of the claim and hired an independent expert); Ginn v. Am. Heritage Life Ins. Co., 173 S.W.3d 433, 443-44 (Tenn. Ct. App. 2004) (setting aside bad faith finding where insurance company had "simply unsuccessfully asserted [a substantive] defense"). Dr. Nylander will have the opportunity to challenge Defendants' "arguably legitimate grounds" at trial. But such opportunity does not automatically come with a chance for a bad faith penalty. Dr. Nylander has not met that burden here.
Accordingly, the Court will grant summary judgment to the Defendant on Dr. Nylander's bad faith claim.
IV. Conclusion
Defendants' Motion for Summary Judgment (Doc. No. 35) will be GRANTED IN PART AND DENIED IN PART. The motion will be granted as to the bad faith claim and denied as to the breach of contract claim. The case will proceed to trial.
The Court will file an accompanying order.

A number of Defendants' objections to Plaintiffs' facts are based on their position that that Plaintiff has adduced improper expert testimony in her own Declaration. The Court rejected that argument in its denial of the Motion to Strike Dr. Nylander's Declaration (Doc. No. 62), and will not revisit the issue.

Dr. Nylander is also trained in obstetrics, but (by choice) has not actively practiced it for nineteen years.

Further, in a letter dated April 8, 1993, from Paul Revere to Dr. Nylander, Paul Revere explained both the definitions of disability and occupation and confirmed: "We understand your current occupation to be that of a specialist in the field of obstetrics and gynecology." (Doc. No. 40-4 at 29.)

The "Elimination Period" is a number of days preceding the date benefits become payable during which injury impairs the insured (e.g., ninety days). (Doc. Nos. 40-2 at 8; 40-3 at 7.) In PR-IDI, this is known as the "Qualification Period." (Doc. No. 40-4 at 7.)

The Court is aware that this equals 105%. This appears inadvertent; the claim form reflects that the 25% surgery time, which was listed on a separate line, included the 5% of surgery-related hospital rounds time. (Doc. No. 40-5 at 8.)

Dr. Haslam did not review the details of the testing appended to Gandy's summary report. (Doc. No. 40-25 at 30-31.)

"CPT codes" are "Current Procedural Terminology" medical codes that are used to report medical, surgical, and diagnostic procedures and services to entities such as health insurance companies and are used in conjunction with numerical diagnostic coding during the electronic medical billing process.

In the words of Dr. Nylander: "If I wore gloves that were too large I might look like a ballerina trying to do the ballet in a set of galoshes. It would be really not feasible to operate in large gloves." (Doc. No. 38-1 at 148.)

For example, in the 12 months prior to April 2015, Dr. Nylander performed about 36 abdominal hysterectomies as lead surgeon. Since then, she has not been able to perform any abdominal hysterectomies as lead surgeon. Similarly, in the 12 months prior to April 2015, Dr. Nylander performed about 50 surgical laparoscopies as lead surgeon. Since her injury, she has not been able to perform any surgical laparoscopies as a lead surgeon. (Doc. No. 47-5 at 5-6.) From a different perspective, in the twelve months prior to her injury, Dr. Nylander earned $84,500 from performing two kinds of lead surgical procedures (abdominal hysterectomies and LAVHs) alone. (Doc. No. 47-5 at ¶ 17.)

As explained by Dr. Nylander: "By the beginning of 2018, my husband and I realized that, because of the substantial drop in the number of major surgical cases, it would be more economical to have a non-physician [ ] assist where he acts as a lead surgeon. The opportunity for me to earn income as an assistant in gynecological surgeries which I am unable to perform as the lead surgeon was unique to my relationship with my husband. I am not aware of any opportunities to serve as an assistant on major gynecological surgical procedures which I can no longer perform." (Doc. No. 47-5 at ¶ 27.)

According to Dr. Nylander, her 2017 income went up because Dr. Wingo's practice entered into a new reimbursement arrangement with a company called Advance Diagnostic Imaging, which raised certain reimbursement rates from certain insurance companies. (Doc. No. 47-5 at ¶ 25.) In addition, Dr. Nylander has income from her side business, She, LLC. (Id. at ¶ 26.) Prior to her injury, in approximately February 2015, Dr. Nylander received training in and started a separate business for female sexual health named She, LLC. She maintains that practice today, including offering laser treatments for vaginal atrophy using the "Mona Lisa Touch" laser. (Id.) In 2016, She, LLC's net revenue was $82,837, and through October 2017, She, LLC's net revenue for 2017 was $76,098.20. (Doc. No. 40-11.) Dr. Nylander has never taken a distribution from this company, but she has paid off the loan used to acquire the laser treatment unit. (Doc. No. 40-16 at 76-85.) Dr. Nylander has stated that the future of this business is unknown because the technology could become obsolete. (Doc. No. 47-5 at ¶ 26.) In addition, Dr. Nylander believes that, as her clinical practice declines, she will meet fewer patients who can benefit from the elective services that She, LLC provides. (Id. ) Defendants dispute the extent to which She, LLC is a "separate" business.

Dr. Nylander has also stated that: "[W]ere it not for my husband [being a surgeon], it would be extremely difficult for me to be employed as a gynecologist. I do not know of any practice group in Nashville that would hire me as a gynecologist, considering that I am unable to work as a lead surgeon on surgeries that are critical to a woman's health." (Doc. No. 47-5 at ¶ 23.)

Defendants briefly argue that Leonor is "inapplicable" here because it was decided under Michigan law. However, for all relevant purposes, Michigan and Tennessee insurance and contract law are in accord. Michigan and Tennessee law both require that contracts be read as a harmonious and logical whole wherever possible. See Royal Prop. Grp. LLC v. Prime Ins. Syndicate, Inc., 267 Mich.App. 708, 706 N.W.2d 426, 434 (2005) ; Maggart v. Almany Realtors, Inc., 259 S.W.3d 700, 703 (Tenn. 2008). Under Michigan law, "[a] contract is said to be ambiguous when its words may reasonably be understood in different ways." Raska v. Farm Bureau Mut. Ins. Co. of Mich., 412 Mich. 355, 314 N.W.2d 440, 441 (1982). Under Tennessee law, a contract is ambiguous if it "may be susceptible to more than one reasonable interpretation." Memphis Housing Auth. v. Thompson, 38 S.W.3d 504, 512 (Tenn. 2001). Moreover, both Michigan and Tennessee law require the Court to strictly construe insurance contracts in favor of the insured if ambiguity is found. Henderson v. State Farm Fire & Cas. Co., 460 Mich. 348, 596 N.W.2d 190, 194 (1999) ; Garrison v. Bickford, 377 S.W.3d 659, 664 (Tenn. 2012). Defendants have offered no plausible explanation as to why the Sixth Circuit would read identical insurance contract language differently under parallel Michigan and Tennessee law.

Numerous cases cited by Defendants in their briefs are from jurisdictions that employ the former view. (See, e.g., Doc. No. 36 at 16-17, 18-21.) As this authority is inapplicable here in light of Leonor, the Court need not discuss it.

Defendants repeatedly rely upon Cohen v. Provident Life & Acc. Ins. Co., 1999 WL 33997571, at *9-10, 1999 U.S. Dist. LEXIS 23478, at *26-27 (N.D. Ga. June 11, 1999), which was superseded by Giddens.

The Court acknowledges that, later in her deposition, Walsh reversed course and contradicted herself by stating that "[Defendants] concluded surgery wasn't an important duty of [Dr. Nylander's] occupation." (Doc. No. 47-3 at 116.) Walsh then essentially admitted she "wasn't sure" how Defendants had measured the impact of surgical procedures on the rest of Dr. Nylander's practice. (Id. at 116-117.) Given that the Court must take all inferences in favor of Dr. Nylander and against the movant, it credits Walsh's initial statement, which is also complementary of other parts of the record. Walsh's original statement also appears to be confirmed by Defendants' summary judgment reply brief, which acknowledges that "Defendants determined Plaintiff to be a gynecologist who performed surgeries." (Doc. No. 51 at 2.)

The Court is not concerned at this point with Dr. Nylander's income from the sexual medicine business She, LLC. First, if Defendants contend that business is part of Dr. Nylander's gynecology practice, there are obviously questions of material fact to be resolved. Second, the court in Leonor was not deterred by the claimant's "side-operation." Leonor, 790 F.3d at 692.

To show bad faith, a plaintiff must prove "facts that tend to show 'a willingness on the part of the insurer to gamble with the insured's money in an attempt to save its own money or any intentional disregard of the financial interests of the plaintiff in the hope of escaping full liability.' " Johnson v. Tenn. Farmers Mut. Ins. Co., 205 S.W.3d 365, 370 (Tenn. 2006) (quoting Goings v. Aetna Cas. & Sur. Co., 491 S.W.2d 847, 849 (Tenn. Ct. App. 1972) ).